IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

PROFESSIONAL HOSPITAL GUAYNABO, INC.        CASE NO.:

    Plaintiff                                    RE:

v.                                              PETITION FOR VACATUR
                                                OF ARBITRATION AWARD

MSO OF PUERTO RICO, INC.

    Defendant

_____/

COMPLAINT

TO THE HONORABLE COURT:

COMES NOW, Plaintiff, Professional Hospital Guaynabo, Inc., ("PHG") by and through its undersigned counsel, Francisco M. López-Romo, and respectfully States and Prays as follows:

I. JURISDICTION

1. Jurisdiction is invoked under 9 U.S.C. §§ 9, 10, 11, 12, 13.

2. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, as this action is brought in the same judicial district in which Defendant, MSO of Puerto Rico, Inc., ("MSO") is registered to conduct business, and where the contract that is at issue was entered into by the parties, and where the health services that have not been paid for were provided, and where the parties' arbitration proceedings actually took place.

3. Plaintiff, PHG hereby respectfully requests the issuance of an Order of Vacatur of this arbitration award, since it is contrary to the public policy

Professional Hospital Guaynabo, Inc. v. MSO Puerto Rico / Complaint

as enuntiated by the Commonwealth of Puerto Rico's Office of Commissioner of Insurance ("0CS").

## II. PARTIES TO THIS ACTION

1. Plaintiff, Professional Hospital Guaynabo, Inc., ("PHG") is an entity with legal capacity to sue and be sued, which was organized and/or exists under the laws of the Commonwealth of Puerto Rico.

2. Defendant, MSO of Puerto Rico, Inc., ("MSO") is an entity with legal capacity to sue and be sued, which was organized and/or exists under the laws of the Commonwealth of Puerto Rico or of any other state.

## III. INTRODUCTION

1. This petition for the Vacatur of an arbitration award is predicated under the following statute:

> "9 U.S. Code § 9. Award of arbitrators; confirmation; jurisdiction; procedure
>
> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall

be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.  (July 30, 1947, ch. 392, 61 Stat. 672.)

9 U.S. Code § 10. Same; vacation; grounds; rehearing

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(b) If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.

(c) The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5.  (July 30, 1947, ch. 392, 61 Stat. 672; Pub. L. 101–552, § 5, Nov. 15, 1990, 104 Stat. 2745; Pub. L. 102–354, § 5(b)(4), Aug. 26, 1992, 106 Stat. 946; Pub. L. 107–169, § 1, May 7, 2002, 116 Stat. 132.)

9 U.S. Code § 11. Same; modification or correction; grounds; order

In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties. (July 30, 1947, ch. 392, 61 Stat. 673.)

9 U.S. Code § 12. Notice of motions to vacate or modify; service; stay of proceedings

Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court. For the purposes of the motion any judge who might make an order to stay the proceedings in an action brought in the same court may make an order, to be served with the notice of motion, staying the proceedings of the adverse party to enforce the award.  (July 30, 1947, ch. 392, 61 Stat. 673.)

9 U.S. Code § 13. Papers filed with order on motions; judgment; docketing; force and effect; enforcement

The party moving for an order confirming, modifying, or correcting an award shall, at the time such order is filed with the clerk for the entry of judgment thereon, also file the following papers with the clerk:

(a) The agreement; the selection or appointment, if any, of an additional arbitrator or umpire; and each written extension of the time, if any, within which to make the award.

(b) The award.

(c) Each notice, affidavit, or other paper used upon an application to confirm, modify, or correct the award, and a copy of each order of the court upon such an application.

The judgment shall be docketed as if it was rendered in an action.

The judgment so entered shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered. (July 30, 1947, ch. 392, 61 Stat. 673.)

### IV. THE ARBITRATION AWARD TO BE VACATED

1. On May 26th, 2020 and notified on May 27th, 2020, the Honorable Arbitrator José R. Negrón Fernández entered an "Award" in the arbitration case of Professional Hospital Guaynabo, Inc. v. MSO Puerto Rico, Case No.: 01-17-0007-5562.  In its pertinent parts, this Arbitration Award reads as follows:

"On May 9th, 2013 MSO of Puerto Rico, Inc. ("MSO"), and Professional Hospital Guaynabo, Inc. ("PHG"), signed a Hospital Services Agreement ("HSA") which provided for arbitration pursuant to the Commercial Rules of the American Arbitration Association ("Rules-AAA") as the alternate dispute resolution method to elucidate any dispute with respect to the performance or interpretation of any clause of the HSA when PHG "is not satisfied with resolution of any matter in controversy submitted to the MSO, and/or the Executive Management of the MSO".

On December 18th, 2017 PHG filed with the AAA a Healthcare Commercial Demand for Arbitration describing the nature of the dispute as "medical and hospitalization services which shall remained unpaid" and claiming a payment of $618,938.00, plus attorney's fees, interest and arbitration costs. Afterward, on January 24th, 2018, MSO requested the dismissal of the case

based on a contractual time bar defense.[2] PHG filed its opposition on February 23rd, 2018.

On June 5th, 2018 the undersigned was formally appointed as Arbitrator in this case and on July 17th, 2018, a Preliminary Scheduling Order ("PSO") was issued stating the following in its pertinent parts:

**Applicable Law**: The Commercial Arbitration Rules of the AAA effective October 1, 2013, and the Federal Arbitration Act will govern the Arbitration. The Professional Services Agreement ("PSA")[5] will be construed and interpreted in accordance with the Federal and the Commonwealth of Puerto Rico Laws.

**Award**:

      a. The Arbitrator will enter a reasoned written award based on the evidence presented at the Final Hearing and pursuant to Article 9.3 of the PSA, which states that the Arbitrator's decision will be considered the 'final determination of the matter in dispute'.[6]

      b. Pursuant to Rule-54 of the Commercial Arbitration Rules of the AAA the parties expressly requested that the Arbitrator allocate parties' expenses in the Final Award.

...

[At Pgs. 18-20:]

**Analysis**

In the Order issued on September 12th, 2018 denying without prejudice MSO's request for dismissal based on the contractual time bar defense, the undersigned evaluated the issue under 'the limited facts submitted at that time' and, under that particular scenario, I concluded that MSO proffered no evidence to support a dismissal at that stage. However, after the Final Hearing the factual scenario is very different.

In the Order dated September 12th, 2018, I advanced an interpretation of Art. 9 of the HSA. Afterward, on June 10th, 2019

the Puerto Rico Court of Appeals issued a Judgment in the case of <u>Mennonite General Hospital, Inc. v. MSO of Puerto Rico, Inc, et als.</u>, KLAN201801337, in which the majority of a three Judge panel adopted a different interpretation of Art. 9 of the HSA.[50] However, this issue does not need to be revisited because the facts that were proved during the Final Hearing clearly show that PHG was aware that the sixty (60) day period to submit the controversy to arbitration was triggered on December 5th, 2016.

The letter dated December 29th, 2016, signed by PHG's external Counsel and sent to MSO with the approval of Valentín González, clearly demonstrates that PHG was aware that MSO's communication dated December 5th, 2016, constituted MSO's final determination rejecting PHGs claims. In addition, PHG's external Counsel admitted that after December 5th, 2016, the only other step PHG had available to solve the controversy was arbitration ("lo único que nos queda es arbitraje"), and that the letter dated December 29th, 2016, was a settlement offer to avoid the costs related to an arbitration procedure. Consequently, there is no doubt that PHG was aware that the sixty (60) day period to submit the controversy to arbitration began to accrue on December 5th, 2016 and expired on February 3rd, 2017.
...

Under this scenario there is no doubt that from December 5th, 2016, PHG had sixty (60) days to submit the controversy to arbitration and, consequently, the demand for arbitration was untimely filed with the AAA on December 18th, 2017 and shall be dismissed."

Please See, **<u>Exhibit 1</u>**.

### V. THE LEGAL GROUNDS THAT SUPPORT THIS PETITION FOR ENTRY OF AN ORDER Of VACATUR OF ARBITRATION AWARD

1   As a matter of law, the "contractual time bar defense" cannot be applicable to this arbitration claim, since any contractual agreement by Plaintiff, PHG and Defendant, MSO setting any "time bar" for submitting

Professional Hospital Guaynabo, Inc. v. MSO Puerto Rico / Complaint

PHG's claims or invoices, as well as for filing an arbitration proceeding for its collection of these same claims for payment for services rendered to Defendant, MSO's health insurance beneficiaries, would be contrary to public policy as been declared by the Commonwealth of Puerto Rico's Commissioner of Insurance. Please See, **Exhibit 2**.

2   The Puerto Rico Office of the Commissioner of Insurance is the administrative agency that has the ministerial duty to ensure at all times that the provisions that are contained in the Puerto Rico Insurance Code and in the Regulations that are promulgated Office of the Commissioner of Insurance, are complied with by any persons or legal entities that may be conducting any health care insurance business in Puerto Rico, or that may be rendering any health care services under its jurisdiction.

3   This Office of the Commissioner of Insurance had previously issued its Normative Letter Number N-PP-3-73-2006, interpreting Act No. 104 of July 19, 2002, that was enacted by the Commonwealth of Puerto Rico to add a new Chapter 30 to Puerto Rico's Act No. 77 of June 19, 1957, that is known as the "Insurance Code of Puerto Rico."

4   This statute establishes the terms that must be observed by any health care insurers and by any other health care service organizations to process its payments of those claims that are submitted by any health care service providers, and this statute and those regulations actually provide for the specific procedures that are available to object to any such claims, and also establish any applicable penalties.

Professional Hospital Guaynabo, Inc. v. MSO Puerto Rico / Complaint

5   The Puerto Rico Commissioner of Insurance's Normative Letters must be complied with by Defendant, MSO and by any other health insurance companies that conduct their health care insurance business in Puerto Rico.

6   The Commissioner of Insurance has previously ruled that any medical and hospitalization services that are rendered in Puerto Rico must be paid for, regardless of "tardiness or late filings" of those claims or invoices. This Normative Letter Number N-PP-3-73-2006 was issued on March 16, 2006, by Dorelisse Juarbe Jiménez while she was acting in her official capacity as the Commissioner of Insurance of the Office of the Insurance Commissioner of Puerto Rico.

7   The Normative Letter is conclusive regarding the terms that were established under Act No. 104 of July 19, 2002, that is known as the "Law for the Timely Payment of Claims to Health Service Providers" and in its pertinent part, reads as follows:

"... the OCS has become aware of certain situations that some health service providers are facing in the processing of their claims before the insurers who subscribe to health care plans and health service organizations ... have adopted the position of not paying for those claims that have been filed after the expiration of the ninety (90) day term established in Article 30.030 of the Insurance Code of Puerto Rico ... it is stated that these parties are refusing to satisfy the payment of claims, when the participating provider has not filed all the necessary documents or responded to the notification of the insurer or health services organization, regarding if the claim is not processable for payment .."

"The OCS being the administrative agency that has the ministerial duty to ensure at all times that the provisions contained in the Puerto Rico Insurance Code and its Regulations are complied with, it is now necessary to establish the parameters that will be

applicable to the situations set forth herein. ... Based on the aforementioned articles of the Law and the Regulations, the OCS is hereby disposing that the only repercussions that a participating provider may be exposed if a claim is filed outside of the term of ninety (90) days, ... or of that term greater than has agreed by the parties under their contract, are: (1) that the insurer of health care plans or health services organization will not have to abide by the terms of timely payment; (2) there will be no imposition of interest for late payment; and (3) that the OCS will not have original jurisdiction over any disputes that arise, so that, as a result of the non-payment by an insurer authorized to subscribe to health care plans or health services organization, the participating provider must file a civil action of collection of monies for those services rendered before the Examining Official with jurisdiction."

"On the other hand, in regards to the term of 45 days provided in Article 30.030, supra, for a health service provider to respond to the objections of an insurer of health care plans or health services organization for payment of a claim, we are hereby disposing that the only effect that a health service provider has on not responding during the aforementioned term is that that party has accepted the reported indications. In no way should it be interpreted that said provision establishes that the participating provider is stripped of its right to be paid for the health services it has rendered but has not submitted, within the aforementioned period, all information or documentation required by the insurer or organization of health services. Likewise, we provide that an affirmative action, within the term of forty-five (45) days, by a participating provider, addressed to answer the objection of the insurer or health services organization, constitutes a response in light of the provisions in Article 30.050, supra, which has the effect of interrupting said term."

"It will only be understood that the participating provider acquiesces to the contention of the insurer or health service organization that their claim is not processable for payment, when the latter omits any response within the established period. Even so, the participating provider will only be deprived of the safeguards granted by Act No. 104, supra, to receive timely payment for the services that he has provided, so he must appeal to the Examining Official with jurisdiction to enforce the agreed-upon obligations."

"Understanding that an insurer or health service organization is released from its obligation to pay for health services provided by a participating provider, when the latter has not submitted its claim

within ninety (90) days, or has not filed all the documents necessary to dispose of the claim or responded to its objection, within the term of forty-five (45) days, would be contrary to the clear provisions of the Act and Rule LXXIII. We must emphasize that Act No. 104, supra, was promulgated with the purpose of guaranteeing to providers the timely payment of their services. Under no scenario does said statute allow insurers or health service organizations to get rid of their obligation to pay for the mere fact that providers do not comply with the terms established by law."

"Finally, we have obtained knowledge that some insurers and health service organizations have circulated contracts to their health service providers that contain clauses that could be contrary to the provisions of the Law. For this purpose, we must warn that the contractual relationships that are established between health service providers and insurers and health service organizations must be similar to the provisions of Act No. 104 and its clear legislative purpose. Bearing in mind that the principle of contractual autonomy between the parties is subordinated to the fact that the pacts, clauses and conditions established are not contrary to the laws, the OCS, in which rests the ministerial duty to administer the provisions of Act No. 104, will not protect an insurer authorized to issue health care plans or health services organization that may use its contracts with providers to establish conditions that have the effect of evading the obligations imposed by law. All disability insurers that are authorized to underwrite health care plans and all health service organizations in Puerto Rico must act in strict compliance with the provisions herein."

Please See, **Exhibit 2**.

8. The uncontroverted facts that were proven during the arbitration hearings were as follows:

9. PHG began its relationship with MSO Puerto Rico during 2009, when PHG began to offer medical/hospitalization services to MSO's beneficiaries as a non-contracted provider.

10. On May 9th, 2013, PHG and MSO executed their contractual agreement whereby PHG would offer its health-care services as MSO's contracted provider. Please see, **Exhibit 3**.

11. With this agreement came increased coordination regarding MSO's patients' health-care services that were being provided by PHG in its hospital's facilities.

12. During 2013, the process of performing concurrent and retroactive utilization review ("auditorías") was implemented by MSO, whereby MSO's representatives would visit PHG's facilities to review in person MSO's patients' medical/clinical records to confirm its beneficiaries' actual medical/hospitalization needs and to verify the quality of the services that were rendered to them. These representatives were referred to as "concurrent review nurses" or CRNs in MSO's Providers Manual.

13. On February 3, 2014, MSO utilization reviewer ("auditora" or CRN) María Arraizaga sent an e-mail to Evelyn Ríos of PHG's Utilization Department's administrative assistant to identify PHG "open cases" that were being "served" during MSO's utilization review visits ("auditorías").

14. These utilization reviews allowed MSO to be fully informed of the medical/hospitalization services that were provided by PHG to MSO's beneficiaries on a contemporaneous manner.

15. As the volume of patients increased, the balance of MSO's denied re-admissions cases exceeded the acceptable levels in the medical industry when compared to Medicare and with all other health plans.

16. During the relevant period of time, PHG's Utilization Department was composed by Dr. Benny Nieves, PHG's Director of Medical Utilization and by his assistant Evelyn Ríos and they held their discussions with MSO's reviewers regarding questioning why several PHG's patients' readmissions cases were "administratively denied" by MSO -a term that described the denials of those cases that were deemed "ineligible" by MSO for payment purposes but that were not cases that were the subject of any additional clinical reviews.

17. The uncontroverted testimony of witness Evelyn Ríos regarding MSO's Clinical Review Nurses ("auditoras") was that they would often neglect to visit PHG for months (e.g., from January 21, 2015 until April 22, 2015, a span of 92 days) thereby impeding PHG to file its claims within the 90 days period that was established under Article 3.14 of the Health Services Agreement.

18. On June 4, 2015, at 3:00 p.m., PHG's representatives met at the office of MSO subcontractor Varis at Chardón Avenue. MSO was represented in this meeting by Zoraida Méndez, Liliana Negrón and Margarita Roena (MSO Manager for Collections and Recollections); PHG, was represented by Dr. Benny Nieves and Sharon López and Evelyn Ríos. Dr. Nieves signed his notes that were taken during that meeting. These contemporaneous notes reported, among other things that Varis would stop all its collections efforts pertaining to MSO payments of thirteen (13) readmissions cases that were discussed during that meeting.

19. On August 4, 2015, Dr. Benny Nieves sent an e-mail to PHG's Auxiliary Administrator Sharon López about his conversations with Mr. Francisco Martínez, PHG Administrator during 2015, when Mr. Martínez had instructed Dr. Nieves to appeal MSO's denial practices.

20. On August 4, 2015, Dr. Nieves explained that Dr. Nieves was under the impression that MSO's letter was referencing to CMS' Readmission Reduction Program (HRRP), but that this CMS program did not apply to Puerto Rico.

21. On October 26, 2015, Dr. Nieves decided that it was important to verify the alleged applicability of the MSO exclusion policy of denying any payments for readmissions cases and after reviewing CMS policies, Dr. Nieves submitted his letter via email transmission to MSO's Hospital and Ancillary Executive Javier Torres, explaining that PHG had been unable to obtain any answer from MSO, and that Puerto Rico and Maryland had been excluded from the CMS' HRRP program.

22. CMS's Medicare sub-contractors or any other health care insurance companies have never applied the HRRP criteria for the readmission's cases to Medicare's beneficiaries in Puerto Rico.

23. On November 17, 2015, MSO's Javier Torres wrote an e-mail to Lcdo. Martínez (PHG Administrator) to cancel their meeting that had been set for November 18, 2015. MSO's Javier Torres stated that MSO would answer in writing "if Puerto Rico and Maryland were actually excluded from CMS' HRRP program."

24. In the meantime, Dr. Nieves began correspondence with Iris Bermudez (PRFO@cms.hhs.gov). On November 25, 2015, CMS confirmed that the readmissions reduction program did not apply to Puerto Rico or to Maryland due to the "existing differences in the state laws defining hospitals" in the two jurisdictions. Please see, **Exhibit 4**.

25. PHG's Dr. Nieves also contacted Puerto Rico's Medicare Administrative Contractor (First Coast Service Options "FCSO") and César Hernández (Operations Manager, FCSO) who then replied on December 2, 2015, and stated that FCSO did not regularly intervene with Medicare Advantage's providers' disputes.

26. A month later, MSO's Javier Torres responded to PHG's Dr. Nieves with letter dated December 15, 2015, that stated that Medicare CMS' policies "were different than those being used by MSO" with respect to its providers such as PHG (essentially invalidating MSO's provider's letter dated 2 January 2014) and quoted "section 3.17 of the PHG-MSO contract agreement" and "Hospital Manual" (sections 7.1.3.1 and 7.1.3.2), neither of which made any mention of any readmissions policy.

27. By that time, PHG had already prepared the initial list with 25 pending claims in the sum of $200,335.29 that was hand-delivered by PHG's Sharon López to MSO during their meeting on December 22, 2015. This list included eleven readmissions claims.

28. On December 23, 2015, PHG's Dr. Nieves wrote an email to Sharon López about the conversation that was held earlier that day. In this

email, Dr. Nieves stated the need for Sharon López to submit another letter to request an "Independent Review" as quickly as possible.

29. As these efforts for collections of monies persisted, PHG's utilization department coordinated another meeting with MSO that was held on February 22, 2016, at MSO's Puerto Rico offices.

30. This February 22, 2016, meeting's agenda was prepared and/or was notified by MSO's witness, Mr. Marcano.

31. The notes of this meeting were sent to Dr. Rafael Franjul Juliao (MSO Associate Inpatient Medical Director), Mr. Jorge Robles (MSO Director of Contracting) and Gina del Valle (MSO Utilization Management Director).

32. On February 22, 2016, the first meeting took place at 10:00 a.m. with Sharon López (PHG's Auxiliary Administrator), Dr. Benny Nieves and Evelyn Ríos. MSO was represented by MSO's witness José Marcano and Gladys Betancourt (MSO's Claims Supervisor) and the main topic of discussion, according to the meeting's notes that were taken by PHG's Sharon López, was the pending balance of PHG's accounts receivables (or "Aging Report") that showed that MSO owed to PHG approximately $400,000 from 2013, 2014, 2015.

33. During this morning meeting, MSO's Marcano notified to PHG's representatives that the topic pertaining to the readmission's claims would be discussed that same afternoon and during this second meeting, Dr. Nieves, Evelyn Ríos, Beatríz Medina (PHG's insurance agent) and Dr. Leonardo Valentín González were present. MSO was being represented

by: Mr. Marcano and Dr. Franjul and Mr. Javier Torres (MSO's Hospital and Ancillary Executive), Other topics that were discussed during that afternoon of February 22, 2016, were other patients' registrations with a pending balance in "the additional sum of approximately $240,000" that were also being owed by MSO.

34. During the afternoon meeting, Dr. Franjul expressed that PHG's "readmissions percentage was higher than those of other hospitals in the island." Dr. Leonardo Valentín testified that he explained to Dr. Franjul that PHG had its own unique peripheral-vascular practice that very often would require medical/hospitalization treatments that were different from those of other hospitals in the island and that Dr. Franjul had been open to this idea and that as a result of these explanations Dr. Franjul had agreed to allow PHG to file those appeals of cases that were covered during the period from February 2016, and onwards and that Dr. Franjul had arranged for additional MSO utilization review visits to be conducted as "MSO's retroactive reviews" rather than MSO continuing to notify and PHG continuing to receive MSO "administrative denials."

35. PHG's Evelyn Ríos testified that the former part did materialize but no other MSO personnel subsequently arrived at PHG facilities to conduct any retroactive reviews of these cases that had already received MSO's "administrative denials" before February 2016.

36. PHG's Evelyn Ríos testified that the result was that the first case that was appealed by PHG and that was listed in PHG Ms. Evelyn Ríos'

business records is that of the patient and MSO beneficiary Nelson Repollet.

37. On May 23, 2016, PHG was provided with MSO's "Review Report" that was conducted by MSO auditor Veronica Medina. This audit report had listed exactly the same two hundred fiftynine claims that were in controversy in this arbitration claim.

38. On or around May/June 2016, PHG's billings department had new leadership under PHG's witness Leida Tirado, who testified of the renewed collection efforts of these previous claims.

39. PHG constantly and consistently insisted that MSO had to pay for any "late" claims for services rendered as well as for any readmission cases.

40. These PHG efforts resulted in MSO supposedly agreeing to re-open the applicable time periods for re-processing the same pending claims and the list or table of these pending claims was circulated during April, May and June of 2016.

41. On June 15, 2016, and on June 30, 2016, PHG re-stated its written request for the "good faith meeting" via PHG legal counsel Rosario Urdaz' letter.

42. On October 13, 2016, PHG requested from MSO to review 184 of the previously rejected claims.

43. On December 5, 2016, PHG's legal counsel received the communication from MSO's Director of Legal Affairs that re-affirmed MSO's previous

determination dated June 13, 2016, that had rejected these two hundred fiftynine claims.

44. On December 29, 2016, PHG's attorneys sent PHG's settlement offer letter to MSO's attorneys Mr. Ramón Dapena and Ms. Laura Torres, pertaining to these two hundred fiftynine claims.

45. PHG's letter with this settlement offer letter has remained unanswered until this date.

46. After communicating with Jay Miranda (MSO's Pro-Care Unit Supervisor), PHG's billing department continued its communications with MSO's Marcano and other MSO personnel while attempting to collect payments for services rendered to MSO's beneficiaries. As examples of these constant communications, the email message that was sent by MSO's Marcano on February 23, 2017, the letter of April 12, 2017, that was sent by PHG's Leida Tirado, inviting MSO's Marcano to visit PHG facilities to discuss these pending claims.

47. On April 24, 2017, PHG's Tirado sent her letter to MSO's Liliana Negrón, MSO's Provider Department, requesting MSO's payment of PHG's services rendered to MSO beneficiaries.

48. Another meeting was held on May 3, 2017, at 2:00 p.m., at MSO's office at #411 Calle Segarra, Bechara Industrial Park and PHG's Leida Tirado, Frances del Valle and MSO's Mr. Marcano participated.

49. During this meeting, PHG's billing department inquired about the status of past claims, including from January through November 2016. MSO's

Marcano refused to discuss these claims and alleged that PHG had submitted "late" claims, that PHG had not visited MSO's Claims Department as MSO's Marcano had expected MSO's providers would do. MSO's Marcano also stated that only PHG's Dr. Nieves and Evelyn Ríos had previously visited MSO's facilities.

50. On May 17, 2017, MSO's Marcano responded to PHG Tirado's letter of April 12, 2017 by stating that PHG's claims pending "were over 90 days late" and would not be paid by MSO.

51. The follow-up meeting to this denial decision was held on June 8, 2017, at PHG 8 Avenida Las Cumbres, Guaynabo. PHG was being represented by: Frances del Valle and Olga Cruz and PHG's Administrator María Mejias, and MSO was represented by José Marcano and Jay Miranda, and Marilyn Romero also participated via telephone call, while PHG Dr. Nieves briefly joined in this meeting.

52. During this meeting of June 8, 2017, MSO's Marcano referred to the letter dated May 17, 2017. After the meeting was held, on or around June 8, 2017, PHG's Tirado was informed about this meeting and PHG's Tirado read the notes that were taken by PHG's Olga Cruz, who testified that PHG had also continued with its collection efforts of these claims by contacting MSO's Zoraida Méndez Román (MSO's Associate VP of Contracting).

53. Another meeting was supposed to be held on June 25, 2017, to further discuss these pending claims, but ultimately, no additional payments for these claims were received anytime thereafter.

54. On September 13, 2017, PHG's utilization department's Evelyn Ríos and PHG's billing and collection department's Leida Tirado and Frances del Valle went to another meeting that was held with MSO's José Marcano, Jay Miranda and Marilyn Romero, to discuss several matters that included the pending claims for 2014-2017.

55. On September 20, 2017, PHG lost any electrical power due to the combined effects of Hurricane Irma and Hurricane María. During this time of crisis, any further collection efforts were halted while PHG's hospital's facilities struggled to offer any services during this national emergency.

56. After this emergency period, PHG's Evelyn Ríos contacted MSO's Utilization Department to try to reach an agreement about the pending appeals process that could then be implemented after the passage of these hurricanes.

57. On January 24th, 2018, MSO's counsel Ramón E. Dapena sent his letter that stated that MSO had "received your email of January 4, 2018, advising of Professional Hospital Guaynabo ("PHG")'s one-page Health Care Commercial Demand for Arbitration form filed before the American Arbitration Association ("AAA")" and that included the Hospital Services Agreement ("HSA") that had been in effect since May 9, 2013.

58. MSO then moved for the dismissal of this arbitration claim by alleging that "the contractual time bar defense set forth in Article 9.3 of the HSA."

59. MSO rested on its argument that: "Article 9.3 of the Dispute Resolution clause in the HAS" states as follows:

> "If Hospital is not satisfied with resolution of any matter in controversy submitted to the MSO, and/or the Exeutive Management of the MSO, the matter in controversy shall be submitted to binding arbitration in accordance with the Commercial Rules of the American Arbitration Association within sixty (60) days of the last attempted resolution...".

60. PHG responded that "MSO's argument that: "the sixty (60) day time bar is relevant at this juncture because PHG presented this arbitration demand almost a full year after its last attempted resolution of the disputed claim, in contravention of Article 9.3 of the HSA. PHG's December 29, 2016 letter reflecting claimant's "last attempted resolution", at the very least, is misleading, due two simple reasons:

> (1) "Exhibit C-374, the "PHG's December 29, 2016 letter" was never responded to by either counsel Dapena and/or by counsel Torres."

> (2) "During May and June of 2017, PHG's employees had held at least two consultations with Mr. José Marcano, MSO's Claims Manager and the subject matters that were then discussed by them must have included the final disposition of all the pending invoices."

61. More recent e-mail transmissions by and between PHG's Evelyn Ríos and MSO's Yanisse García (MSO's Inpatient Supervisor, in Health Management, Inc., and Ms. Cianela Rivera Sánchez (MSO's Supervisor of Intrahospital Utilization and Revision) are dated July 6, 2018. In these electronic transmissions, MSO's Yanisse García expressed her belief

"that she was only able to discuss patients" … "that were listed after patient/beneficiary Celestino González González" because "the others were part of a legal case."

62. PHG's witness Evelyn Ríos testified that she had already inquired from MSO's utilization reviewer ("auditora") María Arraizaga as to why these re-admissions cases were denied and that MSO Arraizaga had insisted that MSO's re-admissions exclusion policy had been "contractually agreed to" by PHG, and these readmissions claims "had been excluded from any reimbursement."

63. PHG's Evelyn Ríos testified that Evelyn Ríos and Dr. Nieves did not find any such exclusion clause either in the PHG/MSO contractual agreement or in then-current CMS' Providers' Manual.

64. PHG's witness Evelyn Ríos also testified that Evelyn Ríos and Dr. Nieves had also searched for any MSO's previous letters addressed to MSO's providers ("cartas circulares") about this subject to no avail.

65. PHG's witness Evelyn Ríos also testified that Evelyn Ríos and Dr. Nieves had constantly been asking from other MSO's utilization reviewers for any satisfactory explanation for MSO's denials of these readmission's cases.

66. On September 12, 2018, the Honorable Jose R. Negron-Fernandez held that Article 9.2 of the HSA did not establish a time period for PHG to move to the second step of the administrative appeal process and that the HSA did not provide for the scenario in which MSO's Executive

Management "doesn't make a recommendation or makes one after the 15 business day period expired".

67. On September 12, 2018, the Honorable José R. Negrón-Fernández held that the HSA does not define "the last attempted resolution" and that "It cannot be concluded that the December 5, 2016 email is the "last attempted resolution" contemplated by Art. 9.3 of the HSA."

68. On September 12, 2018, the Honorable Jose R. Negron-Fernandez held that "In conclusion, MSO didn't establish contractual time bar defense by a preponderance of the evidence."

69. During the arbitration hearings, MSO did not rebut this valid conclusion. During her testimony, MMM Holdings' legal counsel, witness Eyminel Viel (retroactively) claimed that counsel Eyminel Viel was a member of the "Executive Management of MSO" and that the "Executive Management of MSO" and PHG had held this "executive meeting" meeting on March 16, 2016, that this meeting had counted both as the "good faith meeting" as well as the "executive management" meeting. Nevertheless, during cross-examination, MSO witness Eyminel Viel had to admit that she had never announced herself to PHG as "one of the members of the "Executive Management of MSO". More importantly, said meeting of March 16, 2016 was held on a date that certainly was before the "Table" that listed the two hundred fiftynine claims had even been prepared! The specific information regarding said "table" is further discussed herein-below.

70. It is true that "in passing over a contractual time bar defense, the issue is generally one of reasonableness of its enforceability."

71. "Moreover, even if time limits are clear, late filing will not result in the dismissal of the grievance if the circumstances are such that it would be unreasonable to require strict compliance with the time limits specified by the agreement."

72. And "it has been held that "time limits have been waived by a party in recognizing and negotiating a grievance without making clear and timely objection."

73. MSO alleged that state laws and/or state regulations are inapplicable to the contractual relationship existing between PGH and MSO, since MSO is a "Medicare Advantage Organization" ("MAO").

74. MSO alleged that the "contractual statute of limitations defense" soon after PHG initially filed this arbitration claim in 2017, even without allegedly knowing which where the two hundred fiftynine claims that PHG had included in this arbitration claim.

75. This sole fact should be sufficient to show that MSO did not take into consideration any of the facts or the relevant history of all the meetings and of all the previous collections efforts that had taken place regarding exactly the same two hundred fifty nine claims, before MSO could have judiciously decided whether to validly raise this alleged blanket defense, that as a matter of fact, does not withstand any further scrutiny.

76. MSO raised its "statute of limitations defense" by referring to Section 9.3 of the contractual agreement entered by MSO and PHG. "Article 9, Dispute Resolution" states the conditions that had to be met by the parties as part of the agreed-upon dispute resolution process. <u>"The MSO and Hospital agree to meet and confer in good faith to resolve any problems or disputes that may arise regarding the interpretation of this Agreement."</u>

77. The "trial" evidence shows that MSO never actually provided to PHG the "good faith meeting" that should have taken place for the purpose of being able to "confer in good faith" about the two hundred fifty nine claims that PHG had already submitted to MSO prior to April 16, 2016, which are the same claims that were included in the Table that was admitted in evidence, that is dated April 18, 2016.

78. The "good faith meeting" was never granted by MSO. Therefore, no full contractual dispute resolution process was provided by MSO although this was required under the terms of the parties' contract.

79. Also, Article 9.2 of the parties' contract states as follows: <u>"If Hospital is not satisfied with resolution of any matter in controversy submitted to the MSO, the matter in controversy shall be submitted to the Executive Management of the MSO, at which time the disputed matter will be considered and Hospital will be afforded an opportunity to present supporting statements and documentation.</u>" Please see: **Exhibit 3**.

80. PHG's legal counsel Arturo Negrón Vargas testified that on December 29, 2016, counsel Negrón submitted PHG's settlement offer; that PHG had been waiting for MSO's final response to his settlement offer before filing this arbitration claim.

81. The evidence is that MSO had already taken its "executive management's" decision of never responding to this settlement offer.

82. During the arbitration hearings, testimony was heard that prior to the events of Hurricanes Irma and Maria, PHG's billing department's representatives had continuously met with MSO's providers department's representatives and that every time that PHG's representatives made any inquiries about the pending status of the "old" billing claims, MSO's employees -including witness Mr. Marcano's responses were that "they were not going to discuss this matter because it was being handled by [their] legal counsel" ("Eso está en abogados").

83. Lastly, "The claim should not have beeen dismissed unless it is clear that the Claimant has no right to remedy under any state of facts that can be proven in support of his claim." Please see: <u>Pressure Vessels v. Empire Gas</u>, 137 D.P.R. 497, 505 (1994).

84. In summary, this Honorable Court should review and set aside the arbitrator's "manifest disregard of the law".

Professional Hospital Guaynabo, Inc. v. MSO Puerto Rico / Complaint

WHEREFORE, Plaintiff, Professional Hospital Guaynabo, Inc., respectfully requests this Honorable Court to take notice of this Petition of Vacatur of Arbitration Award, and to grant such relief as Your Honor may be determine to be just and proper.

RESPECTFULLY SUBMITTED.

In Miami, Florida, this 24th day of August 2020.

*s/Francisco M. López-Romo*

FRANCISCO M. LOPEZ-ROMO
USDC No.: 118314
P.O. Box 331823
Coconut Grove, Florida 33233
Telephone: 305-772-5577
Email: lopezromo@gmail.com